**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **MATT WATSON** | § | |
| **Plaintiff** | § | |
| | § | |
| **V.** | § | **No. 4:15CV114** |
| | § | |
| **WILLBROS GROUP, INC., ET AL.** | § | |
| **Defendant** | § | |

| | | |
|---|---|---|
| **LARRY WHITE** | § | |
| **Plaintiff** | § | |
| | § | |
| **V.** | § | **No. 4:15CV118** |
| | § | |
| **WILLBROS GROUP, INC., ET AL.** | § | |
| **Defendant** | § | |

## MEMORANDUM OPINION
## DENYING TEMPORARY RESTRAINING ORDER

Before the Court are the following:

**Defendants' Emergency Application for Temporary Restraining Order (Docket Entry #s 7, 9); and**

**Plaintiffs' Objections to Defendants' Supporting Evidence Submitted With Application for Temporary Restraining Order (Docket Entry #s 11, 13).**

The Court, having considered the relevant pleadings and oral arguments from hearings held on March 2 and 23, 2015, is of the opinion the motion should be **DENIED**.

### I. BACKGROUND

Matt Watson ("Watson") and Larry White ("White") (collectively "Plaintiffs") filed two cases against Willbros Group, Inc. ("Willbros") and Chapman Construction Company, L.P. ("Chapman") (collectively "Defendants") in the 219th Judicial District Court of Texas, seeking a

declaration under the Texas Declaratory Judgment Act and asserting claims of tortious interference with contract. Defendants filed counterclaims for breach of contract, breach of fiduciary duty, unfair competition and misuse of confidential and proprietary information, and tortious interference with contractual relations.

On February 17, 2015, Defendants removed the cases to this Court, asserting Plaintiffs seek a declaration of "the respective rights, duties and obligations of the parties under the Chapman Employment Agreement, the Willbros MSP and MICP (performance bonus Plan)." According to Defendants, Plaintiffs are two former senior executives with Chapman, a Willbros subsidiary, whose employment agreement ("Chapman Employment Agreement") incorporated by reference certain covenants contained within another document, the Willbros Group, Inc. 2010 Management Severance Plan for Senior Management ("Willbros MSP"), characterized by Defendants as an ERISA plan.[1]

On February 24, 2015, Defendants filed their motion seeking expedited injunctive relief prohibiting Plaintiffs from continuing employment in competition with Chapman. Defendants further seek an order that Plaintiffs cease and desist all efforts to contact or solicit current Chapman or Willbros employees regarding employment outside the company and cease and desist use of all

---

[1] According to the Notice of Removal, Plaintiffs allege they are not bound to the requirements and covenants of the ERISA Plan, seek to avoid contractual non-competition obligations, and seek a declaration of the parties' respective rights, remedies, and obligations under the Plan, including a determination that they are entitled to a performance bonus following their voluntary resignation. Defendants assert ERISA completely preempts state law regarding the interpretation of the Plan's benefits, and the determination of rights and remedies is a federal question. Plaintiffs have both filed motions to remand, asserting this Court lacks subject matter jurisdiction to hear the cases because they pertain to a dispute between non-diverse parties that do not involve any controlling issue of federal law. According to Plaintiffs, the Willbros MSP is wholly unrelated to the claims asserted in this matter, claims which are state law claims only.

Confidential or Proprietary Willbros or Chapman information, as set forth in the restrictive covenants referenced in Plaintiffs' 2013 Employment Agreements.

On February 27, 2015, Plaintiffs filed an expedited response to the motion, as ordered by the Court. Plaintiffs also filed objections to certain evidence relied upon by Defendants in support of their motion: (1) Affidavit of Johnny Priest, ¶¶ 7, 9-10, 12, 14-22; (2) Affidavit of Herman Bell, ¶ 6; (3) Affidavit of William Atkins, ¶¶ 2, 4; (4) Employment Agreements of White and Watson; and (5) Willbros purported Management Severance Plan for Senior Management.

On March 2, 2015, Defendants filed a reply in support of their application for temporary restraining order. The parties later filed numerous supplemental briefs on various issues, including the Covenant Not to Compete Act, contract recitals and conditions precedent, irreparable harm, and the Statute of Frauds (TEX. BUS. & COMM. CODE ANN. § 26.01).[2]

At the March 2, 2015 hearing on the emergency motion, both parties consented to proceed before the undersigned for the sole purpose of resolving Defendants' Emergency Application for Temporary Restraining Order.

---

[2] Plaintiffs assert the constraints in the MSP are imposed on Plaintiffs for a period beyond one year; thus, the MSP is subject to the Statute of Frauds and as such is not enforceable unless signed by the person to be charged with the agreement.

## II. FACTUAL BACKGROUND[3]

### A.    The parties' briefing

Willbros Group, Inc. is a Houston-based global contractor specializing in energy infrastructure serving the oil, gas, and electric power industries. Chapman Construction Co., L.P. is a wholly-owned subsidiary of Willbros Utility T&D Holdings, Inc., and both are indirectly held by Willbros Group, Inc. Chapman is headquartered in McKinney, Texas.

White and Watson, two former Chapman senior executives, signed employment agreements in 2013. Watson worked for Chapman as a Vice President. (Watson Aff., ¶ 2). White worked for Chapman as a Senior Vice President. (White Aff., ¶ 2). White and Watson resigned from Chapman on January 9 and 18, 2015, respectively. Both later accepted employment with Quanta Utility Services – Gulf States, Inc. d/b/a/ Hargrave Power, Inc. ("Quanta-Hargrave" or "Quanta"), a competing entity.[4]

According to Defendants, following their resignations, White and Watson recruited numerous Chapman personnel and crew members to leave Chapman and join them in competition against it. Specifically, Defendants assert nine key long-term employees of Chapman's headquarters office in McKinney have resigned since January 24, 2015, including Chapman's Vice President of Substations, Controller, HR Director, Safety Director, and Fleet Manager. Defendants assert

---

[3] The factual findings are based on uncontested factual averments in the parties' pleadings, oral and written arguments, and witness testimony at the hearing March 2 and 9, 2015. Any findings of fact and conclusions of law in denying this application for TRO are provisional.

[4] According to Priest, Quanta-Hargrave is a competitor of Willbros and Chapman. (Priest Aff., ¶ 11).

Chapman has also lost approximately 42 key Chapman field employees, including foremen, supervisors, and crew members. (Priest Aff., ¶ 19).

According to Defendants, Plaintiffs' employment contracts each reference certain covenants that restrict White and Watson's ability to enter into competition with Chapman or solicit Chapman employees or customers if they resign from the company. Defendants assert the employment contracts for White and Watson each incorporate via reference two standard programs that govern the employment of all Willbros Group Senior management: the Management Incentive Compensation Program (the "MICP Bonus Program") and the Willbros MSP.

Under the terms of the Willbros MSP, "Participants" agreed to specific restrictive covenants described therein relating to confidentiality, non-competition, and non-solicitation. (Orig. Pets., ¶ 12). Among other things, the Willbros MSP (a) prohibits Participants from sharing or disseminating confidential and proprietary information; (b) prohibits Participants from competing against Willbros by accepting employment with a Willbros competitor for one year after the Participant separates from Willbros; and (c) prohibits Participants from soliciting employees and/or clients of Willbros for one year after the Participant separates from Willbros. In addition to imposing restrictive covenants upon Participants, the Willbros MSP entitles Participants to a "Severance Benefit" (as described therein).

In their response to Defendants' motion, Plaintiffs point out that § 2.1 of the MSP is captioned "Participation," and it expressly provides as follows:

> An employee shall be entitled to be a Participant if the Employee is selected for participation by the Board and *signs an Acceptance of Participation*, in a form acceptable to the Company, at any date prior to the date of an event (i.e. prior to a Change in Control for purposes of Section 3.1.1 and prior to a Separation from

Service for purposes of Section 3.1.2) which would cause the Employee to be entitled
to a Severance Benefit.

(Willbros MSP, § 2.1) (emphasis added).  Plaintiffs allege they were never shown or provided a copy

of the Willbros MSP, and they never signed the Willbros MSP or signed any type of acceptance of

participation in the MSP; thus, they argue they are not "Participants" under the Willbros MSP.  *Id.*,

¶ 15.

At the end of the Willbros MSP document, certain exhibits are attached including a document

that is entitled "ACCEPTANCE OF PARTICIPATION IN THE WILLBROS GROUP, INC. 2010

MANAGEMENT SEVERANCE PLAN FOR SENIOR MANAGEMENT" (referred to herein as the

"MSP Acceptance Form").  *See* Pl. Exhibit G-3, MSP. Among other things, this MSP Acceptance

Form includes a statement for the employee to acknowledge: "I have received a copy of the Plan, that

I have reviewed the terms of the Plan, and that I hereby agree to all terms of the Plan."  *Id.*  The

MSP Acceptance Form then goes on to discuss ancillary covenants in the Plan that could restrict

or limit future employment of the employee.

Even though neither White nor Watson signed the MSP Acceptance Form and assert they

could not have done so because they never received a copy of the Willbros MSP, Defendants assert

the Willbros MSP was properly incorporated by reference in the employment contracts signed by

Plaintiffs.  Thus, Defendants contend Plaintiffs are "Participants" under the terms of the Willbros

MSP and are bound by the restrictive covenants described therein relating to confidentiality, non-

competition, and non-solicitation.

**B.     Hearing testimony**

White and Watson both testified at the March 2 and 23 hearings.  The testimony, in pertinent part, reveals as follows.  In October of 2014, White met over lunch with his financial advisor Chad Prestwood with Western company.  At that time, White asked Mr. Prestwood about the Chapman non-compete agreement.  It was White's understanding that § 1.1 of the agreement applied only while White was actually working for Chapman. White did not discuss the agreement with Mr. Prestwood again until after he resigned in January 2015.

White and Marchbanks met with Quanta's Chief Operating Officer ("COO"), Duke Austin, in November of 2014.  According to White, there was no discussion regarding Oncor during that meeting.  Nor was there any discussion of White leaving nor any "hint" of there being a job offer from Quanta.  (3/23/15 Tr. at 10: 11-17).  White stated the COO did ask, as they were leaving the meeting, if White would ever consider coming to work for Quanta.  White responded he might, but he did not know.  *Id.* at 11:2-16. White did not recall there being any discussion of his non-compete agreement during the meeting.

White sent a resignation email to Tom Johnson January 9, 2015.  At that time, White did not have a job offer from Quanta. White did not return to his office after his resignation, and he did not take any files or any confidential documents from his office.  According to White, someone sorted out his personal stuff and brought it to him.  White had been off of work for several weeks prior to his resignation due to knee surgery.

In his letter of resignation, White did not provide a reason for the resignation.  White had not decided at that time whether or not he was going to retire at age 67.  White stated he resigned in large part because Chapman had terminated Marchbanks for cause and also because of the direction in

which the company was heading (growing larger despite having difficulty handling the work). *Id.* at 17:15-18:22. White had been friends with Marchbanks for 25 years, and he had decided he was going to leave Chapman after Marchbanks was fired without cause. According to White, Willbros was also having problems paying bills as well as other fiscal problems.

On January 12-13, 2015, White decided he wanted to continue working, and he contacted Mr. Austin, asking if there was a job available at Quanta. White's first conversation regarding employment with Quanta was either January 12-13, 2015 when White contacted Mr. Austin. *Id.* at 19:9-20:7. Shortly thereafter, Mr. Austin and White met in person, and Mr. Austin brought White an offer letter, which White accepted. White started working for Quanta January 14, 2015.

White talked to Watson the day after White resigned. White told Watson he did not know at that time what he was going to do but that he would let Watson know. After White signed his employment contract with Quanta, White informed Watson he was going to work for Quanta. There was no discussion at that time about Watson coming to work for Quanta. According to White, there were no discussions about Watson leaving Chapman and coming to work for Quanta at any time before January 18.

White did not discuss his non-complete agreement with Quanta between January 9-14, 2015. The Western company had a copy of the contract and gave it to White's attorney. White assumes Western also gave a copy to Quanta. White does not recall the first time he disclosed the non-compete agreement to Quanta.[5]

---

[5] White may have discussed his non-compete agreement with Darren Austin at the managers meeting in Las Vegas around January 29, 2015. (3/23/15 Tr. at 66:2-7).

Marchbanks and White met with Duke Austin's cousin, Darren Austin (President of N. Houston Pole Line), on or around January 15, 2015 at the offices of Can-fer, another Quanta-owned company. Marchbanks did not work for Quanta at that time. Representatives from Western company, used by Quanta when purchasing companies, were also present. According to White, they discussed starting a new company from the "ground up." This was the first discussion White had with anyone about starting a new company. At a later meeting at Western offices, White was informed of the new company being started. Watson attended the second meeting with White. Watson had already resigned from Chapman at that time and was made an employment offer at that meeting.

Watson resigned from Chapman January 18, 2015. Watson resigned because of the many changes following Marchbanks' departure from Chapman, and "there were also some business challenges that [he] couldn't support from an operations perspective that were going on within the UTD organization." (3/2/15 Tr. at 118:7-13). Watson called White that afternoon and told him he had resigned and wanted to know if "he had a job." *Id*. at 118:22-119:2. White told Watson to call him the next week. *Id*. at 123:5-7.

According to White, Watson called him the evening of January 18, telling White he had resigned. According to both White and Watson, their first discussion about Watson's employment with Quanta was January 18 after Watson's resignation from Chapman. When Watson called White to tell him about his resignation, White voluntarily told Watson he would check and see if there was a place for Watson. Watson had other employment offers already.

White testified he talked with Darren Austin the following day about hiring Watson and another individual, Mr. Melton. Darren Austin agreed to make them an offer. White told Watson

there was an offer. Watson testified he was offered a job on January 20, 2015 and signed the offer the following day. (3/2/15 Tr. at 117:16-17)(3/23/15 Tr. at 228).

Darren Austin, White, Watson, Mr. Melton, and Western employees Doug Frazier and Don Woodard, met sometime around January 19-24, 2015. A new company was formed after this meeting. The new company was named Hargrave Power, Inc. ("Hargrave"). According to White, the name had been decided by at least January 20. Darren Austin is President of Hargrave.

Priest testified Chapman has lost a total of three field crews following White and Watson's departures. (3/2/15 Tr. at 75:3-18). There have been anywhere from 55-125 employees at different levels of management who have left Chapman, approximately 1/4 of its entire workforce.[6] *Id*. at 75:16-18; *see also* Cause No. 4:15cv114*, Docket Entry #27 at pg. 5, ¶ 16. According to Defendants, "White and Watson were right in the middle of this loss." (Cause No. 4:15cv114, Docket Entry # 27 at pg. 5, ¶16). A lot of these individuals worked on Oncor projects at Chapman. White agreed this could have an effect on Chapman's ability to perform effectively work done being done for Oncor (3/23/15 Tr. at pg. 70).

In his affidavit, White states he has had one contact with an Oncor representative since his resignation from Chapman, and at that time, he made clear that he was not asking for work for which Chapman was performing for Oncor. (White Aff., ¶ 8). White states he asked only that his new

---

[6] White testified some Chapman people called him regarding employment, but he did not call anyone. White further testified Watson may have contacted some Chapman people. At the March 2, 2015 hearing, however, Watson testified he called Mr. Atkins, an employee with Willbros T&D, trying to recruit him to come to Hargrave from Chapman and wanting to tell him about the opportunities available at Hargrave. (3/2/15 Tr. at 127:10-25). Watson also contacted Herman Bell, an employee of Willbros, to talk to him about coming to work for Hargrave. *Id.* at 128:14-20. Watson later explained he did not solicit those individuals; they asked him about opportunities. (3/23/15 Tr. at 232).

company be considered for overflow work that Chapman could not do. *Id.* According to White, there are "several other companies that serve as secondary providers for Oncor, such as Great Southwest, Power Secure, and PLS, among others. The customers who use goods and services in our industry are commonly known throughout our industry. In fact, many of the customers post bidding opportunities and/or work opportunities on the internet." *Id.* At the hearing, White testified that if Chapman could not perform certain work due to lack of labor, a secondary provider such as Hargrave could perform more of the overflow work. White testified Hargrave has not received any overflow work from Oncor or Xcel.

In addition to Defendants' concerns over being able to successfully service the approximately four years remaining on Chapman's contract with Oncor, Defendants also have concerns regarding its work with Xcel Energy, one of Chapman's other major customers. (3/2/15 Tr. at 80:11-12). According to Priest, Watson was the primary customer representative for Xcel Energy on the transmission side as well as on the distribution side. *Id.* at 60:17-22. In his affidavit, Priest states one of Watson's key areas of responsibility was to oversee Chapman's contract with Xcel Energy. (Priest Aff., ¶ 8). Priest states Watson abruptly resigned with Chapman on January 18, 2015 and accepted employment with Quanta-Hargrave. *Id.*, ¶ 11. Priest asserts Watson has attempted to recruit key employees of Willbros T&D for his new employer Quanta-Hargrave. *Id.*, ¶ 12. Additionally, Xcel Energy terminated one of its contracts with Chapman on February 5, 2015. *Id.*, ¶ 13. According to Priest, Chapman had an Xcel project in New Mexico, but the management of Xcel had concerns "with the exodus of employees." (3/2/15 Tr. at 64:1-3). Even though Chapman assured Xcel's management that its crews were still intact and Chapman was focused on performing

the work on the task, the task in the contract was later terminated. *Id*. at 64:6-14 & 65:6-7.[7] Priest

was not aware of any other projects that have been cancelled. *Id.* at 70:9-10. Finally, Defendants

assert Plaintiffs' open competition with Chapman has caused "loss of good will and disruptions to

its office and business relationships." (Cause No. 4:15cv114, Docket Entry # 27 at pg. 6, ¶ 19).

### III. TEMPORARY RESTRAINING ORDERS, GENERALLY

A temporary restraining order or preliminary injunction is typically granted, pending trial on

the merits, to prevent irreparable injury that may result before a dispositive trial. *Shanks v. City of*

*Dallas, Texas*, 752 F.2d 1092, 1096 (5th Cir. 1985). The measures are designed to protect, for

example, the status quo of the parties or the evidence the movant will need to use at trial to litigate

his claims. To grant or deny a preliminary injunction or temporary restraining order is within the

discretion of the trial court. *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir.

1984).

A temporary restraining order is an extraordinary, and perhaps drastic remedy; one is not

granted unless the movant clearly carries the onerous burden of persuasion as to all of the elements.

*United States v. Jefferson* County, 720 F.2d 1511, 1519 (5th Cir. 1983). In other words, the movant

has a cumulative burden to prove each of the four enumerated elements. *Mississippi Power & Light*

*Co.*, 760 F.2d 618, 621 (5th Cir. 1985); *Clark v. Prichard*, 812 F.2d at 993. A temporary restraining

order "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*

*v. Natural Res. Def. Council*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed2d 249 (2008).

---

[7] In his affidavit, Watson states he has no knowledge of, and was not involved in any way with, Xcel's termination of one of its contracts with Chapman before that termination. (Watson Aff., ¶ 9). According to Watson, there are several companies that provide services for Xcel Energy, such as North Houston Pole Line, PAR, and Atkinson Power, among others. *Id.*

## IV. DISCUSSION

**A.**     **Obtaining a TRO**

The test for obtaining a temporary restraining order or injunction is well known. The moving party must show that (1) it has a substantial likelihood that it will prevail on the merits of its suit; (2) there is a substantial threat that it would suffer irreparable injury without an injunction; (3) its threatened injury outweighs the threatened harm to the non-moving party; and (4) granting the injunction will serve the public interest. *Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 285 (5th Cir. 1999); *see also Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). "The denial of a preliminary injunction or temporary restraining order will be upheld where the movant has failed to sufficiently establish *any one* of the four criteria." *Black Fire Fighters Ass'n v. City of Dallas, Tex.*, 905 F.2d 63, 65 (5th Cir. 1990).

**B.**     **Analysis**

**1.**     **Likelihood of success on the merits**

To ultimately succeed on their breach of contract claim, Defendants must prove the covenant not to compete, referenced in the signed employment contracts, is enforceable. Covenants not to compete are restraints of trade and disfavored in law; unlike other contracts, they must satisfy statutory requirements to be enforceable. *Travel Masters, Inc.* v. *Star Tours, Inc.,* 827 S.W.2d 830, 832 (Tex.l991); *Zep Mfg. Co. v. Harthcock,* 824 S.W.2d 654, 660 (Tex.App.– Dallas 1992, no writ). "Courts generally disfavor noncompete covenants because of the public policy against restraints of trade and the hardships resulting from interference with a person's livelihood." *Zep Mfg. Co. v. Harthcock,* 824 S.W.2d 654, 658 (Tex.App. – Dallas 1992, no writ). Texas has a statute that

governs the enforceability of noncompetition and non-solicitation covenants such as the ones Defendants are seeking to enforce in this case.

The Texas Covenants Not to Compete Act provides two criteria for the enforceability of such a covenant.[8] TEX. BUS. & COMM. CODE ANN. § 15.50 (a) (Vernon 2002 & Supp. 2004). It must (1) be "ancillary to or part of an otherwise enforceable agreement" and (2) contain "limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." *Id*.

In their initial response, Plaintiffs did not challenge the reasonableness of the subject restrictive covenants.[9] Rather, without waiving any other arguments, Plaintiffs asserted Defendants are not likely to succeed on the merits because the restrictive covenants which form the basis of Defendants' claims are unenforceable based, in part, on the fact that neither White nor Watson signed the Willbros MSP or an acceptance of participation in the MSP.

Under Texas law, in general, contracts must be signed by the party against whom enforcement is sought. *Perez v. Lemarroy,* 592 F. Supp. 2d 924, 931 (S.D. Tex. 2008). The question

---

[8] "The enforceability of a covenant not to compete is a question of law for the court." *Butler v. Arrow Mirror & Glass, Inc.* 51 S.W.3d 787, 792 (Tex. App..-Houston [1st Dist.] 2001, no pet.).

[9] In their Supplemental Trial Brief Regarding the Covenant Not to Compete Act, Plaintiffs assert the MSP contains a very broad "Competitive Business" definition and also purports to prohibit Plaintiffs from engaging or participating in any Competitive Business for a one year period after separation from service "regardless of geographic location." *See* Pl. Exhibit G-3, MSP ¶¶ 1.1.10, 6.2.1. According to Plaintiffs, the combination of the very broad "Competitive Business" definition together with the lack of any reasonable limitation on geographic area covered effectively make this an industry wide exclusion that is clearly broader than necessary to protect the employer's legitimate interest and as such results in the covenant being unenforceable under the Act." (Cause No. 4:15cv114, Docket Entry 24 at pg. 5). The Court addresses this argument in its discussion on the irreparable harm element.

of whether a written contract must be signed to be binding is a question of the parties' intent. *Id.* at 930. "As long as the parties give their consent to the terms of the contract, and there is no evidence of an intent to require both signatures as a condition precedent to it becoming effective as a contract, signatures are not a required factor in the making of a valid contract." *Id.* (quoting *ABB Kraftwerke Aktiengesel/schaft v. Brownsville Barge* & *Crane, Inc.,* 115 S.W.3d 287, 292 (Tex. App.-Corpus Christi 2003, pet. denied).

Plaintiffs rely on an email dated April 9, 2014 from Dennis Berryhill, HR Director-Enterprise Support for Willbros, to Dwayne Marchbanks, former President and Chief Executive Officer of Chapman, asserting this evidence demonstrates Willbros knew (and knows) that an employee must sign an acceptance of participation in the MSP "to become a participant." According to the email, Willbros was conducting an audit of its MSPs "to identify employees who have been selected to be eligible to become a Participant," but who have "NOT executed an Acceptance of Participation in the MSP." *Id.* In this e-mail, Mr. Berryhill told Mr. Marchbanks: "The acceptance must be acknowledged by you BEFORE you can become a participant, agreeing to all of the terms and conditions." *Id.* Mr. Berryhill went on to tell Mr. Marchbanks that, in reviewing Mr. Marchbanks' employment agreement, "it specifically states that you must execute an Acceptance of Participation in order to become a participant in the MSP for Senior Management." *Id.*

Plaintiffs also rely upon language in the Watson and White Employment Agreements which expressly provides the agreements are "contingent on" Plaintiffs' "execution of a Participation Agreement" under the Willbros MSP. *See* Pl. Exhibit G-1. According to Plaintiffs, this "contingent" language demonstrates Chapman's intent not to be bound by the agreements, or bear any contractual

obligations to White or Watson, absent the execution of the MSP. Therefore, Plaintiffs argue the execution of the Willbros MSP was a condition precedent to contract formation. *See George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976)(A condition precedent is an act or event that must occur before there is a right to immediate performance and before there is a breach of contractual duty).

According to Plaintiffs, because this condition precedent did not occur, the Employment Agreements are not valid contracts and may not be enforced. In their supplemental brief regarding the Covenant Not to Compete Act, Plaintiffs further argue the employment agreement and the MSP contained illusory promises only, and Plaintiffs' employer could have terminated them at any time due to the fact the MSP (or a participation agreement under the MSP) was not signed by Plaintiffs. Plaintiffs state there was effectively an "at-will" employment relationship between Plaintiffs and the employer, and an employment-at-will relationship, by itself, does not constitute an "otherwise enforceable agreement," because either party may terminate the relationship at any time.

In response, Defendants assert the Employment Agreements and Willbros MSP are totally separate contracts. According to Defendants, Plaintiffs wrongly construe a mere recital as rendering the employment agreements invalid, despite the parties' treating the agreements as binding and Plaintiffs' having received salaries and benefits under the agreements.[10] Defendants assert recitals are not strictly part of the contract and will not control the operative phrases of the contract unless those phrases are ambiguous. *Furmanite Worldwide, Inc. v. NextCorp, Ltd.*, 339 S.W.3d 326, 336

---

[10] Plaintiffs assert the "subsequent conduct of the parties did not and could not possibly cause the existence of otherwise enforceable agreements at the time the employment agreement[s] [were] made." (Cause No. 4:15cv114, Docket Entry #24 at pgs. 3-4).

(Tex.App. – Dallas 2011, no pet.). However, recitals should be reconciled with operative clauses and given effect so far as possible. Only where a recital is so inconsistent with a covenant or promise that they cannot be harmonized, the latter, if unambiguous, prevails. *AFD Fund v. Midland Mgmt.*, 2002 WL 731813, *6-7 (N.D. Tex. 2002).

The Court does not need to determine at this time whether execution of the Willbros MSP is a condition precedent to the employment contract validity/enforceable (and thus voids the White and Watson Employment Agreements).[11] Regardless of whether the Employment Agreements are valid contracts, the language in the separate Willbros MSP indicates an employee must sign an Acceptance of Participation for that employee to be a "Participant" in the MSP.

No one seems to dispute that neither White nor Watson were ever shown the Willbros MSP. It is also undisputed that White and Watson never signed a copy of the Willbros MSP. Upon Plaintiffs' resignations, Jennifer Breyer, a former Chapman Human Resources Director from 2013 through January 28, 2015 with access to Plaintiffs' personnel files, reviewed White's personnel file and confirmed there was no copy (signed or unsigned) in his file. (Breyer Aff., ¶ 5). According to Plaintiffs, the same is true for Watson.

Dwayne Marchbanks, former President and Chief Executive Officer of Chapman who was terminated "without cause" on December 31, 2014, states in his affidavit that White and Watson were subject to his supervision and were asked in the spring of 2013 to sign two proposed employment agreements. (Marchbanks Aff., ¶¶ 2-3). According to Marchbanks, neither Dennis Berryhill of Willbros Group nor Johnny Priest, President of Willbros Utility T&D Segment, provided

---

[11] According to Johnny Priest, President of Willbros Utility T&D Segment (which is comprised of Chapman and three other operating companies), employees do not have to sign the separate Willbros MSP.

Marchbanks any proposed Willbros MSP or other such document, nor did they mention such a document to him. *Id.*, ¶ 3. At no time thereafter did anyone from Chapman or Willbros indicate in any way to Marchbanks that White or Watson were supposed to sign an MSP document. *Id.*, ¶¶ 5-6.

Defendants argue it is irrelevant whether or not Plaintiffs signed the separate Willbros MSP, indicating their intent to participate. According to Defendants, the Employment Agreements at issue incorporated the Willbros MSP by reference, having referred to the MSP throughout the employment agreements; thus, White and Watson are bound by the MSP's terms, and they "may not use ignorance of its terms as an excuse." *See* TRO App., pg. 17. In support of this proposition, Defendants rely on a recent Texas Supreme Court case where the court held "when the party has an opportunity to" read a contract and chooses not to do so his failure to read the contract is not excused, and the "law presumes that the party knows and accepts the contract terms." *Nat'l Prop. Holdings, L.P. v. Westergren*, 58 Tex. Sup. Ct. J. 204, 2015 Tex. LEXIS 1, *12-14 (Jan. 9, 2015).

The *Westergren* case involved a release agreement that fully set out the proposed terms of the deal between the parties (as noted by Plaintiffs, no part of the terms were comprised of an unsigned and/or unseen document that was incorporated by reference). There, Westergren, the party challenging the enforceability of the release agreement, had the opportunity to read the agreement, but he chose to sign it without reading it; instead, he relied on the other party's oral representations regarding the contents of the agreement. *Id.*

Here, Plaintiffs did not have ample opportunity to read the Willbros MSP (neither Chapman nor Willbros ever provided the MSP or any acceptance of participation to Plaintiffs). Even if Defendants had provided White and Watson with copies of the MSP and had given them an

18

opportunity to read it, the MSP, by its express terms, indicates that an employee is not a participant unless the employee signs an acceptance of participation.

Defendants further rely on *Preston Exploration Co., LP v. GSF, LLC*, 669 F. 3d 518, 524–25 (5th Cir. 2012), arguing Texas law expressly approves parties' incorporating contractual provisions by reference to another, unsigned document. However, as pointed out by Plaintiffs, the agreements at issue in that case were oil and gas purchase and sale agreements ("PSAs"), and the unsigned documents that were incorporated by reference were exhibits to the PSAs describing oil and gas leases to be conveyed. *Id.* The exhibits at issue were actually attached to the PSAs, and there was no dispute as to whether the contracting parties had been provided or seen copies of the exhibits, and there was no contention that the exhibits, by their own express terms, had to be signed in order to be effective.

Plaintiffs' Original Petitions seek a declaration under the Texas Declaratory Judgment Act and assert claims of tortious interference with contract. Defendants filed counterclaims for breach of contract, breach of fiduciary duty, unfair competition and misuse of confidential and proprietary information, and tortious interference with contractual relations. Without even ruling on Plaintiffs' persuasive arguments regarding the invalidity/unenforceability of the restrictive covenants within the MSP (as conditions precedent to the Employment Agreements and also as unreasonable in scope), Defendants still have not demonstrated a substantial likelihood they will prevail on the merits of the case.

Importantly, the Willbros MSP unsigned document at issue was not attached to the Employment Agreements that incorporated it by reference; White and Watson were never provided with copies of the unsigned document; and the unsigned document, by its own express terms, had

to be signed (or an acceptance of participation had to be signed) in order for the document to be effective. As urged by Plaintiffs, an employee signing a Chapman employment agreement does not automatically become a participant in the MSP; instead, the documents expressly require the employee to sign a separate signed acceptance of the MSP in order to be a participant - this did not happen. Without a valid and enforceable agreement containing a reasonable restrictive covenant, Defendants have not demonstrated a substantial probability they will succeed on the merits at least for purposes of obtaining a temporary restraining order.[12]

Having failed to sufficiently establish one of the four required criteria for a temporary restraining order, the Court could deny the application for temporary restraining order without considering the remaining elements. *See Black*, 905 F.2d at 65 ("The denial of a preliminary injunction or temporary restraining order will be upheld where the movant has failed to sufficiently establish *any one* of the four criteria."). However, for purposes of this Order, the Court will consider the remaining elements.

---

[12] It is also important to note there is a substantial question as to whether the Court has jurisdiction over this matter. Plaintiffs have filed a motion to remand these cases, wherein they rely on, among other cases, *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236 (5th Cir. 1990), asserting claims totally independent from the existence and administration of the ERISA plan are not preempted by ERISA. Plaintiffs state they are not participants under what Defendants characterize as the separate Willbros MSP and are not seeking an interpretation of benefits under the undisputably ERISA plan; thus, there is no question of the rights and benefits under the plan. On the other hand, Defendants rely on *Blake v. Young Phillips Corp*., 158 F.Supp.2d 654 (E.D.Tex. 2010), asserting the question of whether Plaintiffs are participants is itself a preempted issue. According to Defendants, Plaintiffs are seeking a declaration of the rights, duties, and obligations of the parties under the Employment Agreements and the Willbros MSP, placing this case within the parameters of ERISA's complete preemption.

## 2.     Threat of irreparable harm

Defendants argue that injury resulting from the breach of restrictive covenants such as those at issue in this case "is the epitome of irreparable injury," and that the "mere breach of these agreements-standing alone-establishes an irreparable injury." In their Hearing Brief Regarding Irreparable Harm (Docket Entry #s 18, 21), Defendants rely on *Am. Ex. Fin. Advisors, Inc. v. Scott*, 955 F.Supp. 688, 692-93 (N.D. Tex. 1996), asserting the irreparable harm element is automatically established when there is a breach of a non-compete agreement.

Putting aside the question of the validity of the contracts between Plaintiffs and Defendants, Defendants may not avoid the necessity of showing irreparable harm merely by claiming breach of non-compete agreements. *Brink's Incorporated v. Dana Patrick, et al.*, Civil Action No. 3:14cv775 (N.D. Tex. June 26, 2014). Defendants must "submit evidence and carry [their] burden to demonstrate that there is a substantial threat that [they] will experience irreparable harm, regardless of whether it alleges" Plaintiffs will violate their employment agreements. *Id.* In attempting to carry their burden, Defendants assert they are presently suffering irreparable injury due to the actions of Watson and White. Specifically, Defendants assert Chapman is being forced to rapidly hire new employees and subcontractors at a premium cost to fulfill its contractual obligation to Oncor, its largest customer.

According to Priest, White was intimately involved in "valuing, negotiating, and servicing Chapman's construction contract with its primary customer, Oncor Electric Delivery, LLC. . . ." (Priest Aff., ¶ 15). Priest asserts White resigned January 9, 2015 and is now employed by Quanta-Hargrave or another Quanta-affiliated company. *Id.*, ¶ 17. According to Priest, White was seen meeting with Oncor representatives, attempting to solicit their business to his new employer. *Id.*,

¶ 18. Priest further states on or about January 24, 2015, a "recruiting meeting took place where Chapman employees were told that declining oil prices were adversely impacting Chapman and Willbros Utility T&D Segment, and that [they] were very unstable and were likely to fail." *Id.*, ¶ 19. Priest asserts after that meeting nine key long-term employees of Chapman's headquarters' office resigned, and 42 other key Chapman employees later resigned. *Id.* In his affidavit, White asserts he never attended or participated in a "recruiting meeting" that Priest alleges took place on or around January 24, 2015. (White Aff., ¶ 7).

There is no evidence Chapman has currently lost any Oncor business. (3/2/15 Tr. at 86:1-3). With respect to the alleged damage arising from or relating to the loss of the one Xcel Energy project, there is no evidence this was caused by or related to any actions of Plaintiffs. According to Priest, Quanta had been doing secondary work with Oncor before the departure of White and Watson. *Id.* at 88:2-5. Priest had no knowledge of whether Quanta or Hargrave is doing more or less business with Oncor than before the men departed Chapman. *Id.* at 88:6-9.

The Court is not convinced the "exodus" of Chapman employees resulted from any improper actions of White or Watson. Priest testified at the March 2 hearing that Chapman terminated former president Marchbanks without cause before the resignations of Watson and White. (3/2/15 Tr. at 83:6-21). Priest testified Chapman has not made any calculation of the impact on the company of the termination of Marchbanks. *Id.* at 84:10-13.

To establish an irreparable injury, the applicant must show that it cannot be "adequately compensated in damages or the damages cannot be measured by any certain pecuniary standard." *Rogers v. Daniel Oil & Royalty Co.,* 130 Tex. 386, 110 S.W.2d 891, 894 (1937). Irreparable harm requires a showing that: (1) the harm to plaintiff is imminent; (2) the injury would be irreparable;

and (3) that plaintiff has no other adequate legal remedy. And "only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction." *Criterion Brock, Inc. v. Aguirre*, No. CIV.A. H-11-1877, 2011 WL 2517319, at *3 (S.D. Tex. June 23, 2011) (citing *Chacon v. Granata,* 515 F.2d 922, 925 (5th Cir.1975) and *Canal Auth. of the State of Florida v. Callaway,* 489 F.2d 567, 573 (5th Cir.1974).

As urged by Plaintiffs in their Supplemental Reply Brief Regarding Irreparable Harm, Defendants have an adequate remedy at law because they can sue for damages, which they have done in their lawsuit filed in Harris County, Texas against Quanta in *Willbros Utility T&D Holdings, LLC, and Chapman Construction Co., L.P. v. Quanta Utility Service – Gulf States, Inc. d/b/a/ Hargrave Power, Inc., Can-Fer Utility Services, LLC, and North Houston Pole Line, L.P.* in Cause Number 2015-07959, in the District Court of Harris County, Texas, in the 152 Judicial District. Priest acknowledged Defendants have filed a separate lawsuit against Quanta in Houston in connection with the departure of these employees. *Id*. at 88:10-21. Priest further testified as follows:

> Q. All right. So, as of today, you don't have any personal knowledge of any evidence of monetary damage that Mr. Watson and Mr. White have caused Chapman, do you?
> A. No.
> Q. But if there is damage arising from Quanta's employment of either them or other employees, your company is suing Quanta in Houston for those damages, true?
> A. Correct.

*Id.* at 89:6-15.

Defendants have not submitted sufficient evidence to demonstrate a substantial threat of irreparable injury. Defendants have failed to show a substantial threat that Defendants will suffer irreparable injury if a TRO is denied.

### 3.    Balance of the harms

Defendants are seeking to enforce restrictive covenants against White and Watson that were contained in the Willbros MSP never provided to them or signed by them while they were employed by Chapman.  In the unsigned MSP, the term "Competitive Business" (being the business in which Plaintiff is prohibited from participating) is very broadly defined. Pl. Exh. G-3, ¶ 1.1.10. In addition, the MSP provides that the provision applies "regardless of geographic location." *Id*., ¶ 6.2.1. Plaintiffs assert the combination of the very broad "Competitive Business" definition together with the lack of any reasonable limitation on geographic area covered effectively makes this an industry-wide exclusion that is clearly broader than necessary to protect the employer's legitimate business interest. (Docket Entry # 28 at pg. 4)(citing *Hardy v. Mann Frankfort Stein & Lipp Advisors, Inc*., 263 S.W.3d 232, 250 (Tex. App.—Houston 2007, pet. granted).[13]

If these unsigned covenants are enforced by temporary restraining order, Watson and White would be prohibited from continuing employment with their present employers (and possibly in the relevant industry altogether) and prohibited from competing with Defendants or soliciting Defendants' customers or employees for a one year period. The enforcement of these restrictive covenants against Watson and White would materially restrict their ability to earn a living, and the harm to Watson and White would outweigh the threatened injury to Defendants in failing to enforce unenforceable restrictive covenants.

---

[13] In their Response to Plaintiffs' Trial Briefs, Defendants assert Texas law requires courts to reform an overbroad covenant.  See TEX. BUS. & COMM. CODE § 15.51(c) (Vernon 2014). However, as urged by Plaintiffs, Defendants did not introduce any evidence establishing reasonable restrictive covenants from which the Court could reform the unsigned MSP. "Defendants have provided no evidence to illustrate in what limited fashion the covenants could be enforced or in what way they could be reformed and still protect Defendants' business interest."  (Cause No. 4:15cv114, Docket Entry # 28 at pg. 4).

On the other hand, Defendants have failed to show the threatened harm to them outweighs this potential harm to Plaintiffs. There was testimony at the hearing by forensic examiner Chris Graham, suggesting Watson deleted 293 files from a flash drive Watson had while working for Chapman, including Chapman price sheets, in late January and early February 2015. Although Watson agreed there were Willbros/Chapman documents on the flash drive, Watson testified he and his attorney in West Texas deleted only confidential information from his prior employer, Xcel Energy. Watson testified he does not think any Willbros information was deleted. According to Watson, if any Willbros documents were deleted, he does not know who did it, and it was done so without his knowledge or consent. Importantly, in their affidavits, Watson and White state they do not currently have and are not using any confidential or proprietary information of Chapman. (Watson Aff., ¶ 7)(White Aff., ¶ 6).

Defendants have failed to show they suffered any damage from Watson's relationship with Oncor or that they lost any business with Oncor. Additionally, Priest testified he has no personal knowledge whether Watson or White "had anything to do with the loss of . . . [Xcel]." (3/2/15 Tr. at pgs. 18-25). Although Chapman has lost employees recently, there is no evidence the employees left as a result of Plaintiffs' alleged actions. There is no evidence granting relief will address Chapman's employee issues.

Based on the evidence in the record, the Court does not find the threatened harm to Defendants outweighs the potential harm the temporary restraining order would cause to White and Watson.

**4.      Public interest**

Under the facts and circumstances of this case, the Court finds granting the requested temporary restraining order and enforcing the unsigned restrictive covenants would not serve the public interest.

## V.  CONCLUSION

The Court, having carefully considered the four factors, finds Defendants have not carried the heavy burden of persuasion as to all the elements as set forth above.  Defendants' request should be denied.  Based on the foregoing, it is hereby

**ORDERED** that Defendants' Emergency Application for Temporary Restraining Order (Docket Entry #s 7, 9) is **DENIED.**

**SIGNED this 6th day of April, 2015.**


CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE